# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

SABRINA L. JENKINS,        *
                               *
        Plaintiff,      *
                               *
    v.                  *      CV 106-120
                               *
MCG HEALTH, INC. and      *
THOMAS KELLY, JR.,        *
                               *
        Defendants.     *

---

## O R D E R

---

Plaintiff filed the captioned case requesting relief under 42 U.S.C. 2000e *et seq.* ("Title VII"), and under Georgia state law. Presently before the Court are Defendants' motions for summary judgment. (Doc. nos. 54, 59.) Upon consideration of the briefs submitted by counsel, oral argument on September 27, 2007, and the relevant law, Defendants' motions are **GRANTED**.

## I. BACKGROUND

Defendant Kelly was the Chief Financial Officer ("CFO") for MCG Health, Inc. ("MCG") in Augusta, Georgia, at all times relevant to this action. (Kelly Dep. at 26.) On July 1, 2000, MCG hired Plaintiff for the position of Accountant I. (Pl.'s Dep. at 31.) Shortly after Plaintiff started work at MCG, Kelly asked Plaintiff if she would be willing to date his son, Thomas Kelly, III. (Id. at 98, 100.) Plaintiff agreed, and she and Thomas were in a relationship for approximately six months. (Id. at 103.)

After Plaintiff's relationship with Thomas ended, Defendant Kelly invited her to lunch one day in February 2001. (Id. at 104.) At lunch, Kelly told Plaintiff that he was lonely

and wanted to have a relationship. (Id. at 106.) According to Plaintiff, she "gave in" to pressure from Kelly and began what became a relationship of frequent sexual encounters that lasted over four years. (Pl.'s Aff. ¶ 3.) It is undisputed that Plaintiff and Kelly had sexual encounters at various residences, local and out-of-town hotels, and at MCG offices. (See generally Pl.'s Dep. at 116-20.) The sexual activities Plaintiff and Kelly engaged in from Spring 2001-Fall 2005 were frequent and varied. For example, Plaintiff testified that in 2001 and 2002 alone, she had sexual encounters with Kelly once or twice a week. (Pl.'s Dep. at 118.) Plaintiff admits that she and Kelly engaged in oral, anal, and vaginal sex. (Id. at 259.) These encounters involved using various sexual devices, watching adult videos, frequenting strip clubs, purchasing adult novelties, and engaging in at least one "threesome." (See generally Def. Kelly's Mot. for Summ. J. at 4-8.)

Plaintiff maintains that she engaged in sexual relations with Kelly because she was "afraid for her job." (Pl.'s Aff. ¶ 4.) In fact, Plaintiff testified that she gave in to Kelly's sexual demands because she wanted to please him and keep him from becoming angry or vindictive toward her. (Id. ¶ 5.) According to Plaintiff's own testimony, she "did not want to alienate a man who was obviously in a position to help [her] in [her] career." (Pl.'s Aff. ¶ 5.)

## A. Plaintiff's Break in Employment with MCG

In December 2002, Plaintiff resigned from MCG to take a position as a Senior Decision Support Analyst at a hospital in Greenwood, South Carolina. (See Pl.'s Ex. 1.) She went from a salary of $37,000 at MCG to a new salary of $51,000. (Pl.'s Dep. at 34, 36.) Upon leaving MCG, Plaintiff wrote a letter of

appreciation to Kelly for the opportunity to work at MCG. In this letter, Plaintiff stated that it had been a "pleasure working with [Kelly] and representing the company as a Financial Analyst." (Id. at 123.) Plaintiff wrote: "This decision has nothing to do with the exceptional opportunity you have provided me here. You and the hospital have been more than fair with me, and I genuinely appreciate all your support." (Id., Ex. 7.) Plaintiff also completed an exit survey upon leaving MCG. Notably, Plaintiff did not indicate that she had any dissatisfaction with her job or any other reason for resigning related to her relationship with Kelly. (Id. at 125; Ex. 8.) Rather, Plaintiff indicated on this form that she was leaving for "better pay and/or chance for advancement." (Id., Ex. 8.)

During the time that Plaintiff worked for the hospital in Greenwood, Plaintiff and Kelly continued their sexual relationship. (Id. at 126, 196, 366.) According to Plaintiff, she continued the relationship because she was afraid that things might not work out at her new job. (See Pl.'s Aff. ¶ 7.) In June 2003, after only a brief time in Greenwood, Plaintiff again sought and obtained employment at MCG. (Pl.'s Dep. at 130.) Her new position at MCG was Insurance Billing Manager at a salary of approximately $55,000. (Id. at 37-38.) According to Plaintiff, she and Kelly continued to have sexual encounters during this time. (See id. at 130-31; Pl.'s Aff. ¶ 8.)

**B. The End of the Relationship**

In August 2005, Plaintiff and her twin sister went out to dinner with Kelly. Later that evening, Plaintiff and her sister discussed her relationship with Kelly at which time her sister urged her to end the relationship. Plaintiff testified that at

3

this point she decided to "put an end" to the relationship.[1] (Pl.'s Aff. ¶ 14.)

At this point, Plaintiff began seeing a counselor at the Rape Crisis Center. (Id.) Plaintiff testified that it was because of counseling that she decided to report Kelly's conduct to MCG. (Pl.'s Dep. at 146.) Specifically, Plaintiff stated: "In counseling, you're supposed to grow, and I could not grow knowing that this man could potentially bother me again, and that was a problem for me . . . ." (Id. at 147.)

Plaintiff made her initial report of sexual harassment to MCG on September 20, 2005. (Id. at 261; Hayes Aff. ¶ 11.) MCG commenced an investigation and pursuant to company policy, suspended Kelly during the pendency of the investigation. (Hayes Dep. at 25-26.) Several days later, the investigation team asked Kelly to come in and meet with them. (Id.) During the meeting, Kelly informed MCG personnel that he wanted to resign, and he did so later that day. (Id.) Plaintiff was advised of Kelly's resignation the next day. (Pl.'s Dep. at 74.)

**C.  The Aftermath of Plaintiff's Complaint Against Kelly**

On October 27, 2005, Plaintiff received an annual performance evaluation. (Id. at 159-60; see also Pl.'s Dep. Ex. 6 at P 271.[2]) DiAnn Peeples, Plaintiff's direct supervisor, conducted the evaluation. (Peeples Aff. ¶¶ 3-4.) As was the customary practice, Peeples presented Plaintiff a "draft" or proposed review to discuss at her annual review meeting. (Id. ¶ 6.) Although the draft review graded Plaintiff as "below

---

[1] According to Plaintiff, the last time she had sex with Kelly was the night before she and her sister went to dinner with him. (Pl.'s Aff. ¶ 13.)

[2] Plaintiff's exhibits attached to her deposition are bates-stamped numerically with the letter P preceding the number. The Court cites to these exhibits as they are stamped.

standard" in four categories including the category of "integrity" (see Pl.'s Dep. Ex. 10 at P 115,) Plaintiff's proposed overall performance was "at standard" (see id. at P 116).

The parties dispute Peeples' explanation of the below standard mark for integrity. According to Plaintiff, Peeples told Plaintiff that the mark on integrity was a result of her sexual affair with Kelly. (Pl.'s Dep. at 46-47, 161-70; Pl.'s Aff. ¶ 20.) Defendants, however, point to Peeples' affidavit which states that she "had no knowledge that [Plaintiff] had made a complaint against Kelly" and otherwise did not know of Plaintiff's relationship with Kelly at the time of her evaluation. (Peeples Aff. ¶ 11.) In fact, Peeples claims she gave Plaintiff this rating because she felt Plaintiff released department information before it was complete or verified, which caused MCG leadership to question the integrity of the department. (Id. ¶ 7.) Regardless, during the meeting with Plaintiff, Peeples reconsidered the matter and decided to change the rating for integrity to "at standard." (Id. ¶¶ 9-10.) In making the change, Peeples mistakenly marked the integrity box as "excellent." (Peeples Aff. ¶¶ 9-10.) Accordingly, Plaintiff inadvertently received a higher evaluation. (Id. ¶ 10.) Plaintiff signed and accepted the revised evaluation report which was submitted to MCG management. (Id.; Pl.'s Dep. at 173.)

Shortly after her complaint against Kelly, Plaintiff requested that she be allowed to transfer jobs within MCG. (Pl.'s Dep. at 60, see also Pl.'s Dep., Ex. 6 at P 271.) As a result of her request, she was transferred from her position of Insurance Follow-Up Manager to Decision Support Analyst on or about November 1, 2005. (Pl.'s Dep. at 60.) Plaintiff's deposition testimony concerning her transfer is noteworthy:

Q: Okay. Who did you request to be allowed to make that transfer from Insurance Follow-Up Manager to Decision Support Analyst?

A: Human Resources, Bill Hayes.

Q: And you went to Mr. Hayes and asked to take the new position?

A: I asked for a position -

Q: Okay.

A: Not necessarily that one.

Q: Okay. So you didn't have that one in mind, you just wanted to go to some other -

A: Yes.

Q: - position of same pay?

A: Yes.

Q: Okay. And you retained the same pay when you were moved to this position?

A: Yes, sir.

Q: But it was a move that was made at your request?

A: Yes.

(Id.)

After Plaintiff's transfer, she developed a view that her new position was a "dead-end" job with no significant responsibility or tasks to complete. (Pl.'s Aff. ¶ 21; Pl.'s Dep. at 174-75.) Of note, there is no indication that Plaintiff ever complained to MCG Human Resources about her "dead-end" job. (See Pl.'s Aff. ¶ 21.) Nevertheless, Plaintiff testified that, at this point, she felt that she "could not safely stay [at MCG]. . . [and] there would probably be future retaliation over a period of time that would lead to [her] termination." (Pl.'s Aff. ¶ 21.) As a result, Plaintiff resigned from employment with MCG in the Spring of 2006 and took a position as Budget Analyst

with the Chatham County Board of Education.[3] (Pl.'s Dep. at 43-44.)

## II. PLAINTIFF'S CLAIMS

In her complaint, Plaintiff alleges that (1) Kelly's actions constituted intentional infliction of emotional distress; (2) MCG was aware or should have been aware that Kelly harassed other female employees, and, as such, is liable for the negligent retention of Kelly; (3) Plaintiff was subjected to a hostile work environment in violation of Title VII, and (4) MCG retaliated against Plaintiff for making a complaint against Kelly.[4]

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when no genuine issues remain and the movant is entitled to summary judgment as a matter of law. See Fed. R. Civ. P. 56(c); Beal v. Paramount Pictures Corp., 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving

---

[3]Plaintiff's friend, Carrista Williams, testified that Plaintiff told her she took the job in Chatham County to be with her fiancé. (Def.'s App. at 211, (Williams Dep.))

[4]Plaintiff has abandoned her claim against MCG for intentional infliction of emotional distress. (See doc. no. 75 at 23.) Plaintiff also abandoned any Title VII claim against Kelly. (See doc. no. 77 at 10.)

party. Anderson, 477 U.S. at 255. However, the Court is not required to accept all of the nonmovant's factual characterizations and legal arguments. Beal, 20 F.3d at 458-59. An issue of genuine fact is not created by a party who has testified one way and then tries to create an issue of fact through an affidavit or other testimony to the contrary. See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 658 (11th Cir. 1984); Cantrell v. Delta Airlines, 2 F. Supp. 2d 1460, 1463 (M.D. Ga. 1998).

## IV. DISCUSSION

### A. Title VII Claims Against MCG

### 1. Hostile Work Environment

### a. *Prima Facie* Case

Plaintiff asserts that Kelly's harassing behavior created a hostile work environment and that she suffered both objectively and subjectively severe or pervasive harassment as a result of Kelly's actions. More specifically, Plaintiff claims she was forced into a sexual relationship with Kelly by virtue of his status and by abuse of his power as the CFO of MCG.

For an employee to support a hostile work environment claim under Title VII, an employee must establish: (1) she belongs to a protected group; (2) she has been subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that a basis for holding the employer liable exists. Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

The parties dispute whether Kelly's sexual advances were unwelcome. See Mentor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68

(1986) (holding that the gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome"). In Mentor, the Supreme Court held that the correct inquiry in making a determination of whether conduct was "unwelcome" is not whether a plaintiff's actual participation in sexual intercourse was voluntary; instead, a court must determine whether a plaintiff's conduct indicates the sexual advances were unwelcome. See id.

The Court initially notes that Plaintiff's conduct strongly indicates that her sexual relationship with Kelly was not "unwelcome" for Title VII purposes. Rather, Plaintiff's conduct indicated her willingness and interest in developing a personal, business, and sexual relationship with Kelly both inside and outside of the workplace. Based on Plaintiff's own deposition testimony, she willingly agreed to repeatedly meet with Kelly for dinner, drinks, and personal reasons. It is undisputed that Plaintiff and Kelly had sex on numerous occasions over a span of more than four years. The relationship involved traveling together to other cities. It involved sex at each other's homes and at local and out-of-town hotels. According to Plaintiff, it even included "threesomes," attending strip clubs, watching "adult" movies, and the use of various sexual devices.

Not only did Plaintiff's sexual relationship continue throughout the period of her employment at MCG, it continued the entire time she was working for another employer in another city. Plaintiff maintains that "she was afraid that she might fail" at her new job and that she "did not want to alienate a man who was obviously in a position to help [her] in [her] career." (Pl.'s Aff. ¶ 5.) Plaintiff admits that she calculated

that the relationship would further her career, or, at least, would ensure she "would not fail." (Id.) Indeed, she actively sought to be re-employed with MCG and accepted a position at a higher salary than she previously held.

While Plaintiff admits she and Kelly were engaged in a "lengthy consensual sexual relationship both on and off the worksite" she specifically claims that on two occasions Kelly forced her to have sex against her will. (See Pl.'s Resp. to Kelly's Mot. for Summ. J. at 9.) The first occurred in March 2001 and the other in November 2004. However, it was not until nearly a year after the latter encounter that Plaintiff complained about Kelly to her employer. Plaintiff attempts to explain her failure to complain earlier by stating that she might not have been believed and did not want to jeopardize her position in the accounting department. Federal courts, however, have held that an employee's general fear of repercussion cannot form the basis of the employee's failure to complain of sexual harassment to her employer. See Madray v. Publix Super Markets, Inc., 30 F. Supp. 2d 1371, 1375-76 (S.D. Fla. 1998); see also Paraohao v. Bankers Club, Inc., 225 F. Supp. 2d 1353, 1360 (S.D. Fla. 2002).

While Plaintiff concedes that at times the sexual encounters between Plaintiff and Kelly were consensual, at oral argument Plaintiff steadfastly maintained that any sexual encounters after September 2004 were not consensual. Specifically, Plaintiff points to her deposition testimony in which she claims to have frequently attempted to refuse Kelly's sexual advances during this time, yet the sexual encounters continued until August 2005. (See Pl.'s Dep. at 149-50.)

In sum, the majority of Plaintiff's conduct during the four year period indicated a willingness to engage in sexual relations with Kelly. The parties dispute whether the sexual encounters after September 2004 were consensual. For purposes of resolving this motion, the Court will assume that Plaintiff's contentions are true, and that from September 2004 until August 2005, the encounters were no longer consensual and were unwelcome pursuant to Title VII law. Nevertheless, even assuming that Plaintiff can make out a *prima facie* sexual harassment case, MCG is entitled to the <u>Faragher-Ellerth</u> defense.[5]

## b. **Faragher-Ellerth** Defense

An employer avoids vicarious liability for alleged supervisor sexual harassment under <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998), if:

> (a) [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

> (b) [the] plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

<u>Id.</u> at 765; <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).[6] Because it is an affirmative defense, the employer bears the burden of establishing both of these elements by a preponderance of the evidence. <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1313 (11th Cir. 2001).

---

[5] The Court will assume without deciding that Plaintiff's allegations meet the subjective and objective tests of the severe and pervasive element. <u>See</u> <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17 (1993).

[6] This defense is not available "when the supervisor's harassment culminates in tangible employment action." <u>Faragher</u>, 524 U.S. at 807. As discussed herein, no tangible employment action has been alleged.

### i. Reasonable Care to Prevent and Correct Harassment

The Eleventh Circuit has explained that, in general, a useful starting point in analyzing the first element under the Faragher-Ellerth framework is to determine whether the employer had a reasonable policy to prevent harassment. See Frederick, 246 F.3d at 1313 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). In the case at bar, when Plaintiff came to work for MCG, she received MCG's written Policy against sexual harassment which outlined prohibited behavior and proscribed the procedure for reporting harassment. (See Doc. no. 83 at P 51-53, 57.) Specifically, the Policy made clear that no form of sexual harassment would be tolerated. (See id. at P 52.) The Policy provides three avenues of redress, directing employees to their supervisor, the Vice President for Human Resources, or the Director of Employee Relations. (Id.) The Policy also contains a confidentiality provision. (Id.)

It is undisputed that, as part of her initial orientation after she joined MCG, Plaintiff received training on MCG's Policy and its complaint procedures. (See id. at P 57.) Moreover, it is undisputed that once MCG received Plaintiff's complaint, it investigated the allegations in accordance with its Policy. Importantly, MCG suspended Kelly during the pendency of the investigation. Just days after Plaintiff's complaint, Kelly resigned. MCG then advised Plaintiff of Kelly's resignation. Plaintiff has even conceded that MCG "established an effective harassment policy."[7] (Doc. no. 75 at 17.) In short, the record indicates that MCG acted promptly on Plaintiff's

---

[7]As evidence of the effectiveness of its anti-harassment Policy, MCG has included in the record nine complaints of sexual harassment during the approximate time of Plaintiff's employment with MCG. (See Doc. no. 83 at Ex. I.) According to MCG, each instance was investigated and appropriate action taken, including termination. (See Hayes Aff. ¶ 4.)

complaint when given proper notice of her allegations as required under its Policy.

Thus, no reasonable juror could find MCG did not act with reasonable care to prevent and promptly correct sexual harassment. See Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997) (holding that the first prong under Faraher-Ellerth is met if an employer promulgates a policy that is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress"); Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1288 (11th Cir. 2003)("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow.").

However, Plaintiff is not contesting whether MCG has a valid anti-harassment Policy. Instead, Plaintiff is asserting that MCG had either actual or constructive knowledge of the harassment at issue before Plaintiff filed her formal complaint with MCG's Director of Human Relations in September 2005.

In Coates v. Sundor Brands, Inc., the Eleventh Circuit held that when an employer promulgates an adequate and reasonable anti-harassment policy the employer "itself answer[s] the question of when it [is] deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures." 164 F.3d 1361, 1364 (11th Cir. 1999). As such, Defendant MCG points the Court to the comprehensive testimony of its CEO, its Vice President for Human Resources, its general counsel, and the investigation of the employees who had regular contact with Kelly, who testified that there were no prior complaints of sexual harassment made

13

pursuant to MCG's Policy against Kelly. (Hayes Dep. at 14, 25; Boyd Dep. at 26; Rocker Dep. at 16; Def.'s App. at 232, 234 (Cline Dep.)) Plaintiff has even acknowledged that there were no prior complaints against Kelly made pursuant to MCG's Policy. (Pl.'s Dep. at 90.)

In <u>Madray v. Publix Supermarkets, Inc.</u>, the Court held that once an anti-harassment policy has been effectively disseminated "it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address the problems and grievances." 208 F.3d 1290, 1298-99 (11th Cir. 2000) (citation omitted). The court noted that the employer did not have actual notice of sexual harassment because the aggrieved employee brought her complaints "to individuals not designated by [the employer] to receive or process sexual harassment complaints." <u>Id.</u>

In this case, Plaintiff claims that early in her employment she mentioned to Bob Karlinski that Kelly was acting "bold" towards her. (Pl.'s Aff. ¶ 4; Karlinski Dep. at 40-41.) Notably, Karlinski was not her supervisor and did not hold a management position mentioned in MCG's anti-harassment Policy.[8] (<u>See</u> Doc. no. 83 at P 59, 64-73; Karlinski Dep. at 38.) Plaintiff, like the employee in <u>Madray,</u> complained to an individual not designated by MCG to receive or process sexual harassment complaints. Accordingly, Plaintiff's discussion with Karlinski did not put MCG on actual notice of Kelly's sexual

---

[8]While Plaintiff claims that she thought Karlinski was her supervisor (<u>see</u> Pl.'s Aff. ¶ 4), in an exit survey prior to taking the Greenwood job, Plaintiff answered "always" to the question "whether her supervisor resolved complaints and problems."(Doc. no. 83 at P 62; <u>see also</u> Karlinski Dep. at 27.) Even assuming Plaintiff actually did not know who her supervisor was and even assuming she did not complete the exit survey, her mentioning that Kelly acted "bold" did not put MCG on notice of sexual harassment.

14

harassment, and it cannot be held directly liable on that ground.[9]

While Plaintiff seemingly acknowledges that there were no prior complaints of sexual harassment against Kelly pursuant to MCG's Policy, she nonetheless attempts to impute constructive knowledge upon MCG by referring to unsubstantiated rumors that Kelly had sexual encounters with other women at MCG. (<u>See</u> <u>generally</u> doc. no. 75 at 10-12.) However, the Eleventh Circuit has concluded, as a matter of law, that "an employer is insulated from liability under Title VII for a hostile environment sexual harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternative means of redress." <u>Farley</u>, 115 F.3d at 1554. Thus, Plaintiff's allegation of constructive knowledge is unavailing. <u>See also</u> <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1279 (11th Cir. 2002) (citation omitted) ("[W]hen an employer promulgated an effective and comprehensive anti-harassment policy that is aggressively and thoroughly disseminated to its employees, an employee's failure to utilize the policy's grievance process will prevent constructive knowledge of such harassment from adhering to the employer.").

Ultimately, because MCG had in place an effective anti-harassment Policy which was disseminated and enforced among its

---

[9]Plaintiff also argues that Kelly's long-ago relationship with another MCG employee, Keturah Sanders, should prevent MCG from asserting the <u>Faragher-Ellerth</u> defense. However, Plaintiff has set forth no evidence establishing that MCG or any of its management had any reason to think this relationship was not consensual. Sanders has testified that she and Kelly "were dating," "had a romance together," and "were considered boyfriend/girlfriend." (Sanders Dep. at 15-17.)

employees at the time of Kelly's alleged harassment, MCG has satisfied its burden under the first element of the _Faragher-Ellerth_ defense in that it took reasonable care to prevent and correct the harassment. Plaintiff's claim that she mentioned to a co-worker who she mistakenly thought was her supervisor that Kelly acted "bold" towards her does not change the result.

## ii. Reasonable Care to Avoid Harassment

The second element of the _Faragher-Ellerth_ affirmative defense requires that MCG show that Plaintiff unreasonably failed to take advantage of its complaint procedures or otherwise avoid harm. _Faragher_, 524 U.S. at 807; _Ellerth_, 524 U.S. at 765. The Eleventh Circuit has emphasized that a harassed employee is under a "prompt reporting duty;" a duty expressly imposed by her employer's anti-harassment policy and by "the prophylactic rules the Supreme Court built into Title VII in the _Faragher_ and _Ellerth_ decisions." _Baldwin v. Blue Cross/Blue Shield of Ala._, 480 F.3d 1287, 1306-07 (11th Cir. 2007). In _Baldwin_, the court held that the employee "waited too late to complain" about the harassment she had been subjected to because "[h]er complaint came three months and two weeks after the first proposition incident and three months and one week after the second one." _Id._ at 1307.

Here, Title VII and the explicit terms of MCG's anti-harassment Policy placed Plaintiff under a "prompt reporting duty." In fact, using similar language as in the _Baldwin_ case, MCG's Policy says that an aggrieved employee "should report . . . incidents of alleged sexual or other harassment _promptly_ . . . ." (Doc. no. 82 at P 52 (emphasis added).) Plaintiff did not promptly notify any appropriate MCG official about Kelly's

harassment. Instead, her complaint, made on September 20, 2005, came over four years after she claims to have been first harassed by Kelly and approximately a year after Plaintiff claims that the sexual encounters ceased to be consensual.

In deposition, when asked why Plaintiff waited so long to use the MCG processes to address sexual harassment, she answered that she did not go to Human Resources because she was afraid and wanted to keep her job. (Pl.'s Dep. at 190-91.) In this context, courts have held that to permit an employee to disregard a policy of which she was admittedly aware based on generalized fears would require an employer to be automatically liable for harassment committed by a supervisor and eviscerate the affirmative defense of Faragher-Ellerth. Madray, 208 F.3d at 1296; Baldwin, 480 F.3d at 1307. Thus, courts have reasoned that conclusory allegations of feared repercussions fail, as a matter of law, to overcome the unreasonableness of the employee's failure to report harassment. Howard v. City of Robertsdale, 168 Fed. Appx. 883, 888 (11th Cir. 2006).

In this case, Plaintiff demonstrated only a generalized fear of retaliation, and the record offers no objective evidence to substantiate her fear. Absent a credible threat of retaliation, Plaintiff's subjective fears of reprisal do not excuse her failure to timely report the harassment. The Eleventh Circuit has repeatedly stated that "the problem of workplace discrimination . . . cannot be [corrected] without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts." Coates, 164 F.3d at 1366. The Court recognizes that Plaintiff may have been reluctant to report Kelly's harassment, as victims of

17

supervisory harassment often are. On this record, however, there is no genuine issue of material fact to support a finding that Plaintiff's delay in notifying MCG of the harassment was excusable or reasonable.

In conclusion, an employer may not be held liable for a supervisor's hostile work environment harassment if the employer is able to establish that it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct. Farley, 115 F.3d at 1555. MCG has successfully established each element of the Faragher-Ellerth defense and cannot be held liable as a matter of law for Kelly's actions. Accordingly, MCG is entitled to summary judgment on Plaintiff's hostile work environment sexual harassment claim.

## 2. Retaliation[10]

Title VII prevents an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse

---

[10]Plaintiff's Title VII retaliation claim was not set forth as required in paragraph 8 of the pre-trial order. (See doc. no. 43; see also Loc. R. 16.4 ("[T]he pretrial order shall supersede all prior pleadings . . . .") Accordingly, while the Court could deem the claim abandoned, out of an abundance of caution, the Court addresses the claim herein.

employment decision." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).

Here, it is undisputed that Plaintiff engaged in a statutorily protected activity when she made her sexual harassment report to MCG. As to the second element, the parties dispute whether Plaintiff suffered an adverse employment action. According to Plaintiff, she suffered an adverse employment action by both (1) the proposed low mark for "integrity" on her performance evaluation; and (2) her requested transfer to another position at MCG.

The Supreme Court recently addressed the adverse employment action element of a Title VII retaliation claim in Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. ----, 126 S.Ct. 2405 (2006). In Burlington, the plaintiff complained to railroad officials that her supervisor had repeatedly made insulting and inappropriate remarks to her. Id. at 2409. As a result, the railroad suspended the supervisor and reassigned plaintiff from operating a forklift to standard laborer tasks within the yard. Id. Plaintiff then filed a complaint claiming that the reassignment amounted to, *inter alia*, unlawful retaliation. Id. After a jury trial and an *en banc* appellate review, the Supreme Court granted certiorari to resolve, among other things, how harmful an act of retaliatory discrimination must be in order to fall within the prohibition of Title VII. Id. at 2411.

In answering this question, the Court took a broad view of adverse employment actions in the retaliation context, holding that "the scope of [Title VII's] anti-retaliation provision

19

extends beyond workplace-related or employment-related retaliatory acts and harm" and therefore "is not limited to discriminatory actions that affect the terms and conditions of employment."[11] Id. at 2412-14. Ultimately, the Supreme Court held that an employee must show that "a reasonable employee would have found the challenged action materially adverse." Id. at 2415. In other words, to demonstrate a retaliatory adverse employment action, a plaintiff must show that the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id.

The Supreme Court emphasized that such adversity must be material because Title VII does not protect employees from "those petty slights or minor annoyances that often take place at work." Id. The Court also stressed the objective nature of this standard and that "any given act of retaliation will often depend upon the particular circumstances" and "[c]ontext matters." Id. The Supreme Court reasoned that "[b]y focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position . . . this standard will screen out trivial conduct while effectively capturing those acts which are likely to dissuade employees from

---

[11]As recognized by the Eleventh Circuit in an unpublished opinion, Burlington rejected the Eleventh Circuit's standard requiring a Title VII plaintiff who alleged retaliation to "show that she suffered an action affecting the terms and conditions of her employment." Arnold v. Tuskegee Univ., 212 Fed. Appx. 803, 810 (11th Cir. Dec. 19, 2006).

complaining or assisting in complaints about discrimination."[12]
<u>Id.</u> at 2416.

In the case at bar, neither Plaintiff's transfer or her evaluation rise to the requisite level of materiality to become actionable retaliation under <u>Burlington</u>. Stated somewhat differently, it is clear that as a matter of law these actions would not deter a reasonable employee from participating in protected activity under Title VII. The Court will discuss each alleged adverse action in turn.

**a. Plaintiff's Evaluation**

Plaintiff's contention that the proposed "below standard" mark for "integrity" was adverse fails to meet the materiality standard set forth in <u>Burlington</u>. The parties have not cited any authority discussing <u>Burlington</u> in the context of an alleged retaliatory performance evaluation. The Court, however, finds a similar decision from a district court in this circuit illustrative. In <u>Blackledge v. Alabama Dept. of Mental Health & Mental Retardation</u>, a Title VII retaliation case, the district court examined whether under <u>Burlington</u> a proposed lowered evaluation score was an adverse employment action. <u>See</u> 2007 WL 3124452, *25-30 (M.D. Ala. October 25, 2007). The <u>Blackledge</u> court emphasized that the performance appraisal score did not meet the <u>Burlington</u> standard for adversity because the finalized score remained at a level of at least "satisfactory," and that, although the plaintiff disputed the basis for the lowered

---

[12]Of note, the Eleventh Circuit's previously articulated standard in <u>Doe v. Dekalb County Sch. Dist.</u> is substantively similar to the standard set forth in <u>Burlington</u>. <u>See</u> 145 F.3d 1441, 1447-53(11th Cir. 1998). In <u>Doe</u>, the Eleventh Circuit established an objective, reasonable person standard, and stressed that any adversity must be material. <u>Id.</u> at 1453.

evaluation scores, she failed to show that the scores had any effect whatsoever on her employment beyond hurting her feelings. Id. at *29-30.

In the case at bar, Plaintiff has similarly failed to show that the score had any effect on her employment or otherwise rose to the Burlington materiality threshold.[13] Even more fatal to Plaintiff's claim, it is undisputed that when Plaintiff questioned the unsatisfactory rating for "integrity," Peeples agreed to raise the low mark to "at standard." Once it was changed, Plaintiff reviewed the amended evaluation and signed it. (See Peeples Aff. ¶¶ 9-10.) The only alleged harm which Plaintiff musters is a statement that "such an evaluation, especially on a public document, *would* have been devastating to my career as an accountant." (See Pl.'s Aff. ¶ 19 (emphasis added).) However, it is undisputed that the final evaluation that was submitted to MCG management for review contained an "excellent" under the category of "integrity." (See Peeples Aff. ¶ 10.)

The act which Plaintiff feared, i.e., a low mark for "integrity," did not materialize. At best, the adversity about which Plaintiff complains is an unsuccessful attempt by Peeples to rate Plaintiff's performance within the lower range of the "integrity" category. In this regard, Plaintiff has produced no evidence as to whether the document which reflected the proposed score is part of her personnel file; whether the proposed lower score was ever used to her disadvantage concerning any term of

---

[13] It is worth noting that Peeples' proposed overall performance for Plaintiff was "at standard," or satisfactory. (Pl.'s Dep. Ex. 10 at P 116.)

her employment; or whether the lower score caused Plaintiff any other cognizable harm.

In short, Plaintiff has not shown that the proposed performance appraisal meets the requisite objective materiality requirements of <u>Burlington</u>. <u>See</u> 126 S. Ct. at 2415 (noting that petty slights, personality conflicts, and snubbing by supervisors are generally not actionable); <u>see also</u> <u>Oncale</u>, 118 S.Ct. 998, 1002 (holding that Title VII does not set forth a general civility code for the American workplace).

### b. Plaintiff's Requested Transfer

Plaintiff's requested transfer suffers a similar fate in that a reasonable person could not find Plaintiff's transfer adverse. Perhaps most fatal to Plaintiff's claim is the undisputed fact that she requested to be transferred.[14] Common sense suggests that a reasonable employee would not be dissuaded from making or supporting a charge of discrimination for a requested transfer. Indeed, a transfer cannot be "in retaliation of filing a complaint" if it occurred as the result of Plaintiff's own request.

While Plaintiff claims that she was reassigned to a job that she did not request, nothing in the record indicates that her transfer was involuntary. In fact, after Plaintiff initially talked with MCG personnel about transferring, she "contemplated staying in [her prior position]." (See Pl.'s Dep., Ex. 6 at P 272.) Moreover, the record suggests that MCG made specific

---

[14]Although Plaintiff claims that after her low evaluation she felt compelled to "seek reassignment" (<u>see</u> doc. no. 75 at 18), the record indicates that Plaintiff sought a transfer prior to her evaluation (<u>see</u> Pl.'s Dep., Ex. 6 at P 271-74).

efforts to accommodate Plaintiff's request. (<u>Id.</u> at P 271-72.) To the extent that there was uncertainty as to the work assignments of Plaintiff's new position, Plaintiff ostensibly understood this risk. (<u>See generally</u> <u>id.</u> at P 271-79.)

Even assuming Plaintiff did not request the transfer or was given unpleasant work assignments in her new position, the <u>Burlington</u> Court held that reassignment of job duties is not automatically actionable. 126 S.Ct. at 2417. The correct inquiry as to whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Id.</u> (quoting <u>Oncale v. Sundower Offshore Servs., Inc.</u>, 118 S.Ct. 998, 1003 (1998)).

Notably, in <u>Burlington</u>, the evidence objectively indicated that the track labor duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it." 126 S.Ct. at 2416-17. Unlike <u>Burlington</u>, absent from the record before this Court is any evidence which quantifies the differences between the two positions. The evidence of record establishes that Plaintiff was paid the same amount and had the same benefits as her previous position. There is no evidence that the transfer resulted in less prestige, more difficult work, or that the transfer resulted in less opportunities for advancement.

While Plaintiff claims that she was transferred to a "dead-end" job, her conclusory perception that her new position was a demotion is nonspecific, and her subjective response is not dispositive because <u>Burlington</u> specifically requires the court to examine the material adversity of an action from the viewpoint of an objectively reasonable employee. Furthermore, there is no evidence that Plaintiff ever communicated to MCG her opinion that the new position was a "dead-end job." Instead, Plaintiff simply resigned. In short, considering all the circumstances, there is no evidence to support a conclusion that a reasonable person could find Plaintiff's requested transfer materially adverse.

In conclusion, under the reasonable person inquiry and having considered the totality of the circumstances, the Court finds that Plaintiff has not demonstrated an act which is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington</u>, 126 S.Ct. at 2409. As such, neither Plaintiff's proposed performance evaluation nor requested transfer are adverse employment actions. Accordingly, because Plaintiff has not established a necessary element of her *prima facie* case, the Court grants summary judgment on Plaintiff's retaliation claim.

## B. State Law Claims

When no federal question claims are left in a case such as this, prudential considerations prompt the Court to *sua sponte* question the propriety of retaining jurisdiction over remaining state law claims. <u>See</u> <u>Mergens v. Dreyfoos</u>, 166 F.3d 1114, 1119 (11th Cir. 1999) (stating that a district court may dismiss

state law claims after dismissing federal claims; "[m]ore specifically . . . if the federal claims are dismissed prior to trial, [United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)] strongly encourages or even requires dismissal of state claims" (quotes and cite omitted) (emphasis added)).

Jurisdiction over Plaintiff's state law claims rests solely upon 28 U.S.C. § 1367. Absent Plaintiff's showing she retains viable federal claims against MCG, the absence of a federal claim places supplemental jurisdiction in doubt. 28 U.S.C. § 1367(c)(3). Accordingly, Plaintiffs' remaining state law claims against the Defendants are **DISMISSED WITHOUT PREJUDICE.**

## V. CONCLUSION

Upon the foregoing, Defendants' motions for summary judgment (doc. nos. 54, 59) are **GRANTED.** Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE.** The Clerk is directed to **ENTER FINAL JUDGMENT** for Defendants and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this ___7th___ day of January, 2008.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE